383 F.3d 998
 JERRY'S FAMOUS DELI, INC., Plaintiff-Appellee,
v.
Constantino PAPANICOLAOU, d/b/a Roxy's Famous Deli Restaurant, Defendant-Appellant.
Jerry'S Famous Deli, Inc., Plaintiff-Appellee,
v.
Constantino Papanicolaou, d/b/a RMT Roxy's Famous Deli Restaurant, Defendant-Appellant.
Jerry'S Famous Deli, Inc., Plaintiff-Appellee,
v.
Constantino Papanicolaou, d/b/a RMT Roxy's Famous Deli Restaurant, Defendant-Appellant.
Jerry's Famous Deli, Inc., Plaintiff-Appellee,
v.
Constantino Papanicolaou, d/b/a Roxy's Famous Deli Restaurant, Defendant-Appellant.
 No. 03-55114.
 No. 03-55115.
 No. 03-55119.
 No. 03-56019.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 12, 2004.
 Filed September 9, 2004.
 
 COPYRIGHT MATERIAL OMITTED Daniel J. McCarthy, Hill, Farrer & Burrill LLP, Los Angeles, CA, for the defendant-appellant.
 Steven E. Young, Freeman, Freeman & Smiley, Los Angeles, CA, for the plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California; Robert M. Takasugi, District Judge, Presiding. D.C. No. CV-97-01765-RMT.
 Before: McKEOWN, BYBEE, Circuit Judges, and BREYER,* District Judge.
 McKEOWN, Circuit Judge.
 
 
 1
 This is the latest round in a protracted trademark dispute between Jerry's Famous Deli ("Jerry's Deli") and Constantino Papanicolaou, the proprietor of Roxy's Famous Deli ("Roxy's Deli"). Both "Famous Delis" are Los Angeles-area restaurants featuring a New York/Broadway theme that includes an extensive menu of deli-style fare, Broadway show posters, celebrity photos, and stage lighting fixtures.
 
 
 2
 In this appeal, we affirm the district court's finding of civil contempt against Papanicolaou for violation of a stipulated injunction governing trademark use. We vacate and remand the disgorgement of profits sanction because the record does not provide a rationale for rejecting Papanicolaou's challenges to the auditor's calculations.
 
 BACKGROUND
 
 3
 Jerry's Deli opened in 1978 under the name "Jerry's Famous Deli," thirteen years before Roxy's Famous Deli began operations in the Thousand Oaks area. Jerry's Deli staked out a distinct trade dress featuring New York delicatessen-style fare and decor. Jerry's Deli now boasts several Los Angeles area locations, all of which share a red and white color scheme with green accents, Broadway playbills displayed as the predominant interior decoration, movie-style lighting fixtures, and large deli-style display counters. The Jerry's Deli restaurants all use the same extensive menu and offer takeout and catering services. Since it first opened, Jerry's Deli has traded under a circular mark with the word "JERRY'S" appearing in an arch on the top, centered over the word "FAMOUS", which in turn lies in a straight line above the word "DELI". All three words appear in a style known as "Broadway font."
 
 
 4
 Shortly after Papanicolaou opened Roxy's Famous Deli in 1991, Jerry's Deli sued for trademark infringement. When that action settled in 1993, Papanicolaou agreed to change the logo of Roxy's Deli, modify the menu, and refrain from future infringement of Jerry's Deli's intellectual property rights. In 1997, Jerry's Deli sued again, claiming continued trademark violations. This action led to another settlement and the entry of a stipulated permanent injunction.
 
 
 5
 Two years later, Jerry's Deli filed a motion alleging violation of the injunction and seeking a contempt ruling against Papanicolaou. The district court granted Jerry's Deli's motion, issued an order finding Papanicolaou in contempt, and ordered disgorgement of profits and an award of attorney's fees. The court granted the request for an accounting of Papanicolaou's profits, but did not initially award Jerry's Deli attorney's fees because of its failure to provide an adequately detailed accounting. After additional briefing, the court later awarded Jerry's Deli the bulk of its requested attorney's fees.
 
 
 6
 In response to the disgorgement order, Papanicolaou submitted a profits accounting, which was rejected by the district court as "unreliable," primarily because it was unaudited. The district court then directed the parties to stipulate to an independent auditor or submit nominations for an auditor to be chosen by the court. Because they were unable to reach agreement, the court appointed the auditor proposed by Jerry's Deli. After the auditor's appointment, the parties continued to disagree about the scope of the audit. They resolved their deadlock by stipulating that the auditor would forego the full-blown audit originally ordered by the court and instead perform a "special investigation" of Roxy's Deli's profits during the relevant time.
 
 
 7
 The auditor completed this task approximately four months later, issuing a report dated April 19, 2002, that concluded that the profits for Roxy's Deli amounted to $415,586 for 1997-2000. On May 2, Jerry's Deli filed a "Notice of Filing" of the report, requesting the court to adopt its findings and award treble damages and attorney's fees. Papanicolaou filed an objection to the auditor's calculations on May 10, and requested a hearing to air his complaints. In his opposition, he stated that he intended to file additional documentation.
 
 
 8
 On July 26, Jerry's Deli filed an ex parte application requesting the court to issue a determination based on the auditor's report. Papanicolaou filed an opposition on August 1, again requesting a hearing, and suggesting that in the alternative the court order his opposition brief filed by August 12. On August 6, without a formal hearing, the court ordered Papanicolaou to pay Jerry's Deli $376,920, the auditor's profits figure adjusted to discount the profits earned prior to the injunction order in 1997.
 
 
 9
 Papanicolaou then moved to vacate or amend the court's disgorgement and attorney's fees orders, arguing that the disgorgement order was issued without affording him due process, and that both orders were either void or in need of amendment because the attorney's fees order was based in part on the disgorgement order. The court denied the motion and Papanicolaou appealed.
 
 ANALYSIS
 I. THE CONTEMPT ORDER
 
 10
 The district court's contempt order found Papanicolaou in violation of three provisions of the stipulated permanent injunction. Papanicolaou challenges all three findings. Giving due deference to the district court's determination, we conclude that the district court did not abuse its discretion, nor were its findings in clear error. See SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir.), amended by 335 F.3d 834 (9th Cir.2003) (we review a district court's contempt order for abuse of discretion); In re Dyer, 322 F.3d 1178, 1191 (9th Cir.2003) (we review the underlying findings of fact for clear error). We affirm the contempt order.
 
 A. Overall Trade Dress
 
 11
 We consider first the district court's finding that Papanicolaou violated a provision of the injunction designed to protect the cumulative impression conveyed by certain aspects of Jerry's Deli's trade dress. The injunction order prohibited Papanicolaou from using in combination the following elements:
 
 
 12
 1. Broadway Lettering in its logo, service mark, advertising, promotions, souvenirs, or in-house, take-out or catering menus;
 
 
 13
 2. The colors red and white with green accents as predominant in its advertising, promotions, souvenirs, or restaurant decor;
 
 
 14
 3. Broadway show posters as a predominant feature of its restaurant decor;
 
 
 15
 4. Stage or movie style lighting fixtures in its restaurant decor.
 
 
 16
 In its contempt order, the district court found that Papanicolaou had persisted in using all of the above four elements in a manner likely to create consumer confusion.
 
 
 17
 Considering all the evidence in the record, the district court did not clearly err in finding that: (1) "Broadway lettering appears prominently in Defendant's logo, service mark, advertising... [and] menus"; (2) "the colors red and white with green accents appear predominantly in Defendant's advertising or promotions"; and (3) "Defendant's use of Broadway show posters and stage or movie style lighting fixtures as predominant features of its restaurant decor violates elements 3 and 4 of [the relevant paragraph] of the Injunction."
 
 
 18
 Notwithstanding his assertion that the district court's findings were based on "no evidence," Papanicolaou apparently fails to understand that we may not replace the district court's factual findings with our own unless we are left with a "definite and firm conviction that a mistake has been committed." See Easley v. Cromartie, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). Instead, the theme of his argument seems to be that he cannot be found in contempt of the injunction because he "took ... steps to comply" and "did not engage in a shell game to ... test its boundaries."
 
 
 19
 Specifically, Papanicolaou does not challenge the presence of Broadway lettering in his restaurant's materials. Neither does he contest his continued use of the restricted colors and the Broadway show posters. He argues, however, that neither of these features was "predominant" because "the entire color scheme of the restaurant had changed to earthtones" and the posters were but a "natural advertisement." Both of these arguments miss the point; even if we agreed, we would still have to affirm.
 
 
 20
 With respect to the colors, the injunction limited their use as a predominant feature in Roxy's Deli's "advertising, promotions, souvenirs, or restaurant decor." The district court found them predominant in the menu and outdoor sign for Roxy's — that is, its advertising and promotions. Papanicolaou, however, claims only that the colors were not predominant in the restaurant decor. Because the injunction limited the use of the colors in "advertising, promotions, ... or restaurant decor" — not "advertising, promotions, ... and restaurant decor" — Papanicolaou's argument simply misses its mark. His attack with respect to the Broadway show posters suffers from the same affliction. The injunction restricts Roxy's use of the posters "as a predominant feature of its restaurant decor"; it makes no exception for posters that would be a "natural advertisement."
 
 
 21
 Papanicolaou also urges us to reject the district court's findings as to the lighting fixtures. He insists that his "smaller overhead studio lighting" was categorically different from the "stage or movie style lighting fixtures" contemplated by the injunction. This argument is odd indeed. Apparent in the photographs of the interior of Roxy's are lighting fixtures that look like the type found in theaters and movie studios, a fact not lost on the district court. Whether these are termed "movie style" or "studio" lighting fixtures does not change the fact that their use is limited by the terms of the injunction. We are unpersuaded that the district court erred in finding Papanicolaou in contempt of this provision of the injunction.
 
 B. The Logo
 
 22
 We consider next Papanicolaou's challenge to the district court's determination that he violated Paragraph 1.C of the injunction, which prohibits him from:
 
 
 23
 Using any trade name, logo, service mark or trade dress that is likely to create consumer confusion or mistake as to any connection or association between Roxy's and [Jerry's], or as to any sponsorship or approval of Roxy's, its food, food-related services and/or products by [Jerry's].
 
 
 24
 The district court found Roxy's Deli's logo similar enough to the one used by Jerry's Deli to violate the terms of the injunction. Important to the district court's determination was the fact that both logos are circular, feature a portion of the restaurant name horizontally across the center with the word "Deli" on the bottom, and utilize concentric circles in their design.
 
 
 25
 Papanicolaou contends that his use of the infringing logo could not violate the injunction at issue here because it did not violate the 1993 settlement from the earlier lawsuit. This effort to sidestep the injunction proves unavailing. The question before the district court was violation of the 1997 stipulated permanent injunction, not the 1993 injunction. Because the evidence supports the district court's findings, we reject Papanicolaou's argument on this point as well.
 
 C. The Menu Layout
 
 26
 The district court also concluded that Papanicolaou was in violation of a third provision of the injunction, which prohibits him from:
 
 
 27
 Using any layout, design or arrangement with respect to its in-house, take-out, or catering menus, ... that infringes upon JFD's proprietary rights and interests in its Trade Dress or that is likely to create consumer confusion or mistake as to any connection or association between Roxy's and JFD.
 
 
 28
 The district court found substantial similarity between the takeout menu used by Roxy's prior to July 2000 and the Jerry's Deli menu protected by the injunction order. Papanicolaou admits that there are some similarities between the two menus, but argues that "the primary font-style" of his menu makes it "obvious" that the Roxy's menu is different from the Jerry's Deli menu, and therefore consumer confusion is unlikely.
 
 
 29
 A comparison of the two menus does not convince us that the differences are so obvious or that the district court was off base in its conclusion. Both menus are designed to be folded lengthwise into thirds, resulting in a menu size of 4.5" × 14.5". A hungry patron beholding both folded menus would see the circular logo of each restaurant in the top third of the front of the menu, and the words "Delicatessen", "Restaurant", and "Bakery" in the center. The back panel of both menus feature the phrase "Good Morning! BREAKFAST SERVED ALL DAY AND NIGHT" at the very top. On both menus, "Good Morning!" is written in script and the word "Breakfast" appears in a larger type size. The many items offered by both Jerry's Deli and Roxy's Deli cascade down the panels of their takeout menus in small print organized into two columns. Although it is true that the Roxy's Deli menu uses a different font to list these items, the menus nevertheless remain similar enough to support the district court's finding.
 
 
 30
 II. THE DISGORGEMENT AND ATTORNEY'S FEES ORDERS
 
 
 31
 The remainder of Papanicolaou's arguments challenge only the propriety of the district court's disgorgement order. He maintains that disgorgement of profits was an improper measure of damages, and that in any event, the district court denied him due process as a result of procedural irregularities and erred in calculating the amount of damages awarded. Papanicolaou also disputes the attorney's fees order, but he conditions his argument on the fate of the district court's disgorgement order.
 
 
 32
 We review for abuse of discretion the district court's decision to impose sanctions for contempt, Hook v. Ariz. Dep't. of Corr., 107 F.3d 1397, 1403 (9th Cir.1997), and review for clear error the underlying findings of fact, In re Dyer, 322 F.3d at 1191.
 
 
 33
 Papanicolaou first maintains that Roxy's profits were the incorrect measure of damages as the "profits ... from the restaurant did not result from violation of the Injunction," because revenues did not "noticeabl[y] decrease" after the "violations were remedied." This argument undoes itself.
 
 
 34
 According to Papanicolaou, Roxy's Deli infringed on Jerry's Deli's trademark rights up until the date the parties settled and entered the injunction order, and benefitted from its infringement by receiving increased profits during that time. Then, as soon as the injunction order was entered, Roxy's Deli ceased infringing. Assuming these facts to be true, Papanicolaou argues, Roxy's Deli's profits should have decreased after the entry of the injunction order.
 
 
 35
 The problem with this approach is that it assumes that Roxy's Deli ceased infringing. This point is precisely the issue contested by Papanicolaou's appeal of the district court's contempt order. The district court found that Roxy's Deli had not, in fact, ceased infringing on Jerry's Deli's trademark rights after entry of the injunction, and consequently issued the contempt order. Because we affirm the contempt order, we must also reject Papanicolaou's circular reasoning with regard to the propriety of disgorgement as the measure of damages. We also note that disgorgement of profits is a traditional trademark remedy and the district court's use of profits as a measure for the contempt sanction is hardly a novel proposition. See, e.g., Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 514 (9th Cir.1985).
 
 
 36
 Papanicolaou claims that he was denied his due process right to adequate notice and an opportunity to be heard in conjunction with the district court's determination of the amount of damages. See McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 982 (9th Cir.2002) (due process guarantees litigants, at the very least, "notice and a meaningful opportunity to be heard"). The crux of Papanicolaou's challenge is that the district court never set a firm briefing schedule or held a hearing regarding objections to the auditor's report. Admittedly, there was some ambiguity about the timing of the objections to the auditor's report. Nonetheless, Papanicolaou submitted extensive objections and documentation on two occasions — May 10 and August 1. That he might have submitted more material or objections in a different format had he had notice of a specific "hearing" date is of no consequence. The substance of his objections, including those offered in his motion for reconsideration, was before the district court when it ruled on the contempt sanctions. Papanicolaou had sufficient notice of his obligation to challenge the auditor's report and was offered the opportunity to be heard.
 
 
 37
 Papanicolaou's additional claim that the district court denied him due process because it made a speedy decision on the contempt sanction is a curious one. Papanicolaou's last objections were submitted on August 1 and the judge's decision is dated five days later, August 6. We cannot infer that a prompt decision means that the judge did not give the objections due consideration. Indeed, such a rationale would place a district court under perpetual fire. Litigants could claim that delayed decisions as well as expeditious decisions strip them of due process. In such a no-win situation, there would be no safe time frame for the district court to render a decision. We cannot offer up a magic timeline or benchmark against which to measure a considered discussion. Aspects of the disgorgement issue had been pending in one form or another for more than six months. Under the circumstances here and without something more than pure speculation, we cannot say that the decision was made without full consideration.
 
 
 38
 Although we are unpersuaded by Papanicolaou's constitutional argument, we are left in a quandary regarding his specific factual challenges to the profits calculation. Papanicolaou has consistently objected to the profits calculation made by the auditor. He twice submitted objections accompanied by voluminous documentation.
 
 
 39
 In the district court's order overruling Papanicolaou's objections and finding the appropriate amount of profits awarded to be $376,920.42, the only explanation offered was that it had "reviewed the financial statements prepared by the Auditors and finds them reliable. Defendant's objections to the contrary are hereby overruled." Neither these statements nor any others in the record enable us to discern why the district court rejected Papanicolaou's substantive arguments.
 
 
 40
 On their face, Papanicolaou's objections cannot be dismissed with a wave of the hand. The district court accepted the auditor's profits calculations in toto, once it adjusted for the relevant time period. Although the district court ordered disgorgement as sanctions, the remedy was akin to an award of the infringer's profits under trademark law. See Frank Music Corp., 772 F.2d at 514. Under established law, once gross profits related to the infringement are established, Papanicolaou has the burden of documenting any legitimate offsets. Id.
 
 
 41
 On review we must consider whether the link between the profits and the violations underlying the contempt order is legally sufficient. This we cannot do on the record before us. Nor can we divine whether Papanicolaou's objections relate to legitimate offsets. Papanicolaou offers very specific objections to the particulars of the auditor's calculations, ranging from alleged math errors to the auditor's failure to offset income taxes and Papanicolaou's purported compensation. We have the parties rehashing their district court arguments and advancing their factual theories, but we have no district court findings or rationale to review on these points. The district court essentially dismissed Papanicolaou's objections in a single, conclusory sentence: "Defendant's objections to the contrary are overruled."
 
 
 42
 Although we express no position on the merits of Papanicolaou's challenge to the profits figures, we take seriously our duty to review the district court's findings for clear error and its ultimate decision for abuse of discretion. Because "we cannot determine with any degree of certainty" the rationale for the district court's damages determination and because the opaqueness of the district judge's decision prevents us from undertaking a meaningful review, we remand for further consideration. See Christian v. Mattel, Inc., 286 F.3d 1118, 1121, 1131 (9th Cir.2002) ("On remand, the district court will have an opportunity to delineate the factual and legal basis for its sanction orders."). The district court can likewise address the related issue of attorney's fees upon remand.
 
 
 43
 Accordingly, we AFFIRM in part, VACATE in part, and REMAND. Each party shall bear its own costs.
 
 
 
 Notes:
 
 
 *
 The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation