United States Court of Appeals,

Fifth Circuit.

No. 94-60368.

UNITED STATES LEATHER, INC., Plaintiff-Appellee, Cross-Appellant,

v.

H & W PARTNERSHIP, a Mississippi general partnership, et al., Defendants, Cross-Appellees,

H & W Partnership, a Mississippi general partnership and Walter E. Helms, Jr., Defendants-Appellants, Cross-Appellees.

Aug. 7, 1995.

Appeals from the United States District Court for the Northern District of Mississippi.

Before WOOD,[*] JOLLY and DeMOSS, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

In this diversity action, H & W Partnership and Walter Helms, a general partner, appeal the district court's ruling that the execution of a promissory note in favor of United States Leather by another general partner obligated the partnership. In reconsideration of its earlier grant of judgment as a matter of law in favor of the partnership and Helms, the district court found that Dean Wilkerson, the other general partner, was acting within the scope of the partnership business when he signed a promissory note as a general partner of H & W Partnership. H & W Partnership and Helms appeal, and United States Leather cross-appeals the amount of attorneys' fees allowed by the district court.

I.

---

[*]Circuit Judge of the Seventh Circuit, sitting by designation.

1

Beginning in 1989, Dean Wilkerson [Wilkerson] and Walter Helms [Helms] jointly formed several corporations and one general partnership. All of the businesses were either directly or indirectly involved in the manufacturing of upholstered furniture. Wilkerson and Helms initially formed a holding company, Princeton Industries, Inc., for the purpose of acquiring all of the stock and assets of Pierce-Etheridge Group, Ltd., a manufacturing furniture plant in Booneville, Mississippi. They also formed Artistic of Mississippi, Inc., the purpose of which was to acquire the assets of Artistic Furniture Company of St. Louis. Later that year, Wilkerson and Helms formed DWA of Tennessee, Inc. [DWA]. DWA was organized to purchase some of the assets of Artistic of Mississippi, specifically its furniture manufacturing facility located in Amory, Mississippi. Helms and Wilkerson were the directors, officers, and investors in each of these corporate entities.

Shortly after DWA was formed, Helms and Wilkerson created H & W Partnership [H & W], a general partnership. H & W was formed to purchase the DWA furniture manufacturing facility in Amory, Mississippi and then lease it back to DWA.[1] No written partnership agreement was ever created to memorialize the purpose of the partnership or the respective roles of the two partners.

In October 1990, DWA began purchasing leather from Lackawanna Leather Company [Lackawanna], a division of United States Leather

---

[1]Helms testified that they used the partnership to acquire the property from DWA for tax reasons and to keep DWA debt-free so it could later borrow operating capital.

[USL]. By December 1990, DWA had purchased over $350,000.00 of leather on an unsecured corporate account, balance of which was due in January 1991. In early 1991, Lackawanna's Chief Financial Officer Robert Link [Link] became involved in arranging a repayment plan. DWA and Lackawanna worked out an agreement whereby DWA would pay Lackawanna $10,000.00 every other week on a timely basis and Lackawanna would continue to ship DWA leather. Link testified that the agreement never really took place because DWA neither bought any more leather from Lackawanna, nor made any payments under the contract.

In May 1991, Link visited the Amory plant in an effort to collect on the balance. DWA reaffirmed that they would begin to pay on the account under the terms of the prior agreement. In June 1991, Lackawanna agreed to ship two orders of leather to DWA on a C.O.D. basis. DWA's checks for those shipments bounced, and by the end of June 1991, the balance due on DWA's account was $438,229.65.

On August 8, 1991, Wilkerson and Howard Bloom, another investor in DWA, met with Link and other representatives at Lackawanna's offices in Conover, North Carolina, to discuss payment of the indebtedness and potential future shipments. At the meeting, Wilkerson and Bloom presented a promissory note in favor of Lackawanna for the principal amount. The note provided for payments beginning on August 16, 1991, and that performance on the note was a condition to any future shipments of leather. During this meeting, Bloom encouraged Link to contact another DWA supplier, Quaker Fabric Corporation [Quaker], because DWA had

worked out a similar financing arrangement with them. A few days after the note was signed, Link contacted Quaker and learned that DWA had a similar promissory note with Quaker. The Quaker note, however, required the inclusion of all DWA-related entities as makers to the note, including H & W Partnership.

A few days before the first payment on the note was due, Wilkerson called Link and requested an extension of time. Link, now with the knowledge of the Quaker arrangement, conditioned the extension on making several changes to the note, including the addition of DWA Realty, Pierce-Etheridge, Princeton Industries, and H & W Partnership as makers to the note. The changes were made and Wilkerson signed the note. Approximately at the same time the revised promissory note was executed, Link and Wilkerson signed a security agreement with respect to future shipments of goods by Lackawanna. The security agreement included as "debtors" DWA, DWA Realty, Pierce-Etheridge, Princeton Industries, and H & W Partnership. Both Wilkerson and Helms signed the security agreement. Helms, who had a priority lien on certain assets of DWA, agreed to subordinate his lien in favor of Lackawanna to enable the agreement to be finalized. Helms and his wife signed directly below the H & W Partnership signature line binding H & W as debtors.

Payment was never made on the note and by the end of October 1991, DWA, Pierce-Etheridge, and Princeton Industries went out of business. In February 1992, USL filed its complaint seeking to recover on the promissory note executed by Wilkerson. In January

4

1994, the case proceeded to jury trial and at the conclusion of the evidence, both parties moved for judgment as a matter of law. The district court granted USL's motion with respect to Wilkerson and entered judgment against him in the amount of $438,229.65, plus interest of $193,156.54 for a total judgment of $631,386.19. The district court, however, granted H & W's and Helms' motion based on the finding that Wilkerson's execution of the promissory note on behalf of the partnership went beyond the scope of the partnership business and therefore did not bind H & W or Helms. The court found that the sole purpose of the partnership was to own the real property of DWA in Amory, Mississippi. Judgment was entered on January 27, 1994.

From the date of the judgment, USL had ten days to file post-trial motions. The relevant ten day period would have expired on February 10, 1994. On February 9 and 10, a severe ice storm struck northern Mississippi. Due to the extreme weather conditions, USL was unable to get to the federal courthouse in Aberdeen, Mississippi, in order to make a timely filing of its post-trial motions. The day after the storm, USL filed its renewed motion for a judgment as a matter of law or for a new trial pursuant to Fed.R.Civ.P. 50(b) and 59(a). USL also filed a motion to alter or amend the judgment in its favor to include an award of attorneys' fees and expenses under Rule 59(e). The district court accepted and considered the motions.

On April 25, 1994, the district court, in reconsideration of its earlier judgment, granted USL's motion for judgment as a matter

of law and awarded attorneys' fees.  The court found that the acts of Wilkerson in signing the August 8 note were within the scope of the partnership business because there was a direct relationship between DWA and H & W.  The court also awarded attorneys' fees in the amount of $82,653.50, despite USL's request for a total award of $192,994.00.  H & W and Helms appeal the district court's judgment and USL cross-appeals the amount of attorneys' fees.  Wilkerson does not join in this appeal.

## II.

A party has ten days from the entry of judgment in which to file any post-trial motions, including a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion to amend or alter a judgment.  Fed.R.Civ.P. 50(b), 59(b) & (e).  The requirement that post-trial motions be filed within the relevant ten day period after entry of judgment is jurisdictional, and may not be extended by a waiver of the parties or by a rule of the district court. *Vincent v. Consolidated Operating Co.,* 17 F.3d 782, 785 (5th Cir.1994) (citing *Flores v. Procunier,* 745 F.2d 338, 339 (5th Cir.1984)).  The mover's failure to serve the motion within the ten day limit deprives the district court of jurisdiction to alter or reconsider its earlier judgment. *Flores,* 745 F.2d at 339.  Therefore, we review the rulings on these motions *de novo,* employing the same standards the district court applied. *Wheat v. Pfizer, Inc.,* 31 F.3d 340, 343 (5th Cir.1994); *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1322-23 (5th Cir.1994); *Resolution Trust Corp. v. Cramer,* 6 F.3d 1102, 1109 (5th Cir.1993).

6

Rule 6(a) provides that the last day of the ten day period cannot occur on a day the courthouse is not accessible because of weather or other conditions. In pertinent part, Rule 6(a) states:

> (a) Computation. In computing any period of time prescribed or allowed by these rules, ... the day of the act, event, or default from which the designated period of time begins to run shall not be included. *The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible,* in which event the period runs until the end of the next day which is not one of the aforementioned days.

Fed.R.Civ.P. 6(a). USL argues that under Rule 6(a) their post-trial motions were timely because the severe ice storm that hit northern Mississippi on the last day of the filing rendered the Aberdeen district court clerk's office inaccessible. H & W and Helms contend that USL does not fall within the narrow weather exception of Rule 6(a) because the court was not physically inaccessible to USL. Therefore, they argue, the April 25, 1994, judgment of the court was a nullity.

The consequences of Rule 6(a) are determined by a court's interpretation of "inaccessible." Appellants argue that the exception should be strictly construed to mean that the clerk's office must be physically inaccessible or closed for the day before Rule 6(a) will apply. Appellants point to several bankruptcy cases where courts have interpreted a similar bankruptcy rule and found that physical inaccessibility is required.[2] The appellants argue

---

[2]Bankruptcy Rule 9006(a) is also considered a "weather exception." *See e.g., In re Hotel Syracuse, Inc.,* 154 B.R. 13, 18 (Bankr.N.D.N.Y.1993); *In re Richards,* 148 B.R. 548, 549 (Bankr.N.D.Ill.1993); *In re Bicoastal Corp.,* 136 B.R. 288

that the best evidence the district court's office was accessible was that USL filed a motion to extend time earlier that same day. We find, however, that such a strict construction of the rule is not required. *See e.g., Telephone & Data Sys. v. Amcell F Atlantic City,* 20 F.3d 501, 502 (D.C.Cir.1994) (per curiam) (rejecting "appellees' contention that the clerk's office was not "inaccessible' because it was physically possible to file papers in the district court's 24-hour drop box"); *Frey v. Woodward,* 748 F.2d 173, 175 (3rd Cir.1984); *Connors v. United States,* 711 F.Supp. 479, 480-81 (C.D.Ill.1989); *see also In re Swine Flu Immunization Prod. Liab. Litig.,* 880 F.2d 1439, 1445 (D.C.Cir.1989) (interpreting the time limitation in Federal Tort Claims Act § 2401 in relation to Rule 6(a) and finding counting snow days appropriate in determining last day for filing).

An ice storm that temporarily knocks out an area's power and telephone service and makes travelling dangerous, difficult or impossible, thereby rendering the federal courthouse inaccessible to those in the area near the courthouse, is enough to come within Rule 6(a)'s weather exception. The facts in this case illustrate a situation where accessibility is not merely a matter of whether the clerk's office is open or closed. Thomas Suszek, an attorney in Oxford, Mississippi, was local counsel representing USL. According to Suszek's affidavit, he had planned to transfer the motions via modem to his Aberdeen office on February 10, 1994, in order to have them filed. The storm hit the northern Mississippi

(Bankr.M.D.Fla.1990).

area the night of February 9, 1994, and continued through the next day.  Suszek was physically unable to leave his home during the storm due to felled trees and power lines.  Further, due to the loss of power to the area, the motions were trapped inside Suszek's computer at his office.  Oxford was part of the area declared a Federal Disaster Area as a result of the storm.  Because of the weather and road conditions existing on February 10, 1994, the courthouse in Aberdeen, Mississippi, was not accessible to USL for purposes of filing the post-trial motions.  We find that the Rule 6(a) weather exception cannot be so stringently read to exclude circumstances such as these where the weather in the surrounding area of the courthouse foreclosed access to counsel's office or computer files.  Out-of-state counsel was forced to arrange an emergency, last minute filing at the courthouse which did in fact close later that day.[3]  The weather exception was added to Rule

_____

[3]Appellants argue that because a motion for an extension of time was actually filed on February 10, 1994, in spite of the weather this illustrates that the federal courthouse was not inaccessible.  Suszek, local counsel for USL and located in Oxford, Mississippi, had contacted Wisconsin counsel, Nancy Sennett, via cellular phone and apprised her of the weather problem.  Sennett called the district court and one of the judge's law clerks advised her that she should file for an extension of time which would be granted despite any jurisdictional concerns in normal circumstances, rather than "a piecemeal filing consisting of a barebones motion to be followed by supplemental motions and briefs later."  The law clerk stated that court was currently in session, but was set to close shortly because of the weather.  Sennett followed the law clerk's instructions and arranged by telephone for the secretary in the Aberdeen office of local counsel to prepare and file a motion for an extension of time before the weather closed the court down. We find that this last minute filing in an extraordinary situation done at the request of the district court, combined with the existing weather conditions of the area, does not constitute a finding that the district court was accessible.

9

6(a) to acknowledge that such events may render the clerk's office inaccessible and impose an undue hardship, particularly in the type of post-trial motions involved in this case.[4]  We find that the situation in northern Mississippi falls within Rule 6(a)'s exception for weather and other conditions.

## III.

Next, the appellants ask us to consider whether the district court was correct in finding that Wilkerson's actions in the signing of the promissory note in favor of Lackawanna bound Helms and the partnership.  The district court initially determined that Wilkerson was not acting within the scope of the partnership business because H & W's business was simply to own the DWA property in Amory, Mississippi.  The district court reconsidered its earlier judgment and found that Wilkerson was acting within the scope of the partnership business because there was a direct link

---

[4]In 1985, Rule 6(a) was amended to allow for certain events that may disrupt the ten day filing period proscribed under the Rules.  In regards to this amendment, the Advisory Committee stated:

> Rule 6(a) is amended to acknowledge that weather conditions or other events may render the clerk's office inaccessible one or more days.  Parties who are obliged to file something with the court during that period should not be penalized if they cannot do so....  The Rule also is amended to extend the exclusion of intermediate Saturdays, Sundays, and legal holidays to the computation of time periods less than 11 days.  Under the current version of the Rule, parties bringing motions under rules with 10-day periods could have as few as 5 working days to prepare their motions.  This hardship would be especially acute in the case of Rules 50(b) and (c)(2), 52(b), and 59(b), (d), and (e), which may not be enlarged at the discretion of the court.

Fed.R.Civ.P. 6(a) advisory committee's note.

10

between the business of DWA and the partnership's business.  The district court found that H & W's aid in arranging financing for DWA was an important part of the partnership's business because the partnership's own viability was directly tied to the success of DWA.  We review the district court's grant of judgment as a matter of law in favor of USL *de novo,* using the same standard employed by the district court.  *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 841 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976).  If in viewing all the facts in favor of Helms and H & W, reasonable jurors could not have concluded that Wilkerson was acting beyond the scope of the partnership, judgment as a matter of law in favor of USL was appropriate.  *See Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (5th Cir.1969).

The controlling law is § 9 of the Uniform Partnership Act [UPA] found both at Wis.Stat. § 178.06(1) and Miss.Code Ann. § 79-12-17(1).[5]  That section of the UPA provides:

> (1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.

U.P.A. § 9.  Under the statute, the determinative issue is whether

---

[5]The August 8, 1991, promissory note contained a choice of law provision that stated Wisconsin law governed the note. Because, however, the UPA is controlling and both states have adopted the Act, appellants concede on appeal that Wisconsin law will apply at least to this issue.

11

Wilkerson acted within the scope of the partnership business.[6]

The district court relied on the Wisconsin Supreme Court case *Grotelueschen v. American Family Mut. Ins.,* 171 Wis.2d 437, 492 N.W.2d 131 (1992), in finding that Wilkerson acted within the scope of the partnership business. In *Grotelueschen,* the court held that a partner's actions will be within the scope of the partnership business if the actions benefitted the partnership or furthered its purposes. *Id.* at 453, 492 N.W.2d at 137. Appellants contend that the district court incorrectly relied on that case because it did not deal with whether or not the actions of one partner could bind a partnership in the execution of a note.[7] The appellants argue that *Reliable Pharmacy v. Hall,* 54 Wis.2d 191, 194 N.W.2d 596 (1972), controls this case. In *Reliable Pharmacy,* the court held that the execution of an employment contract by a partner that was consistent with the historical practices of the partnership bound the partnership under Wis.Stat. § 178.06(1). *Id.* at 198, 194

[6]Appellees also argue alternatively that Wilkerson had the apparent authority to sign the note or Helms ratified Wilkerson's actions. Because we find the relevant issue involves whether Wilkerson acted within the scope of the partnership business, we need not address the other arguments.

[7]In *Grotelueschen,* a granddaughter sued her grandfather when he accidently ran over her while mowing the lawn. *Id.* at 445, 492 N.W.2d at 133. The grandfather and his wife were partners in D & R Rentals, a partnership that owned and operated an eight-unit apartment building. *Id.* at 442, 492 N.W.2d at 132. The grandfather was mowing the lawn near a red shed when the accident happened. *Id.* The red shed was apart from the actual partnership property, but it was used to store the tools needed to maintain the apartment grounds. *Id.* at 445, 492 N.W.2d at 133. The court found that the grandfather's actions were within the scope of the partnership because he was maintaining the premises that stored the tools that were used in the business of the partnership. *Id.* at 453, 492 N.W.2d at 137.

12

N.W.2d at 600. Appellants argue that the historical practices of H & W indicate that Wilkerson was not carrying out the partnership business in the usual way when he assumed the Lackawanna debt for DWA. However, whether Wilkerson's actions are analyzed under either case, we find the result is the same.

Although the facts in *Grotelueschen* are distinguishable, the court did set out an appropriate test for determining whether the partner's acts were within the scope of the partnership business: the acts of a partner will bind the partnership if they are done to further or benefit the partnership. *Id.* at 453, 492 N.W.2d at 137. It is not disputed that there was a direct relationship between DWA and H & W. H & W's own viability depended on the continuation of DWA because H & W relied on the rental income from DWA to pay its mortgagees. Therefore, in order to keep DWA in business, DWA needed raw materials, including leather from Lackawanna, and it was the business of the partnership to ensure DWA had access to financing so it could acquire these materials. The acts of Wilkerson in executing the promissory note in favor of Lackawanna indirectly, but with certainty, benefitted the partnership.

Appellants argue that *Reliable* governs the facts in this case. In *Reliable,* the court found a partner's execution of an employment contract bound the partnership to liability on the contract. *Reliable,* 54 Wis.2d at 197-98, 194 N.W.2d at 599-600. The court held that "[t]he execution of the contract comports with the historical practices consistently followed by the partnership and ... the authority of [the partner] was actual authority." *Id.* at

13

199, 194 N.W.2d at 600. It is the appellants' argument that under *Reliable* a different test is used whereby the determinative factor is whether the partner's acts were consistent with the historic practices of the partnership. *Id.* Appellants contend that under this standard there was no evidence to suggest that either H & W was created for any other purpose than to own the property it rented to DWA, or that H & W's dealings with DWA were anything more than the receipt of a rent check each month. Helms and H & W contend the evidence clearly established that Lackawanna had never transacted with H & W before the August 8 promissory note.

We first note that the standard in *Reliable* does not set out a completely different test in determining partnership liability based on the actions of partners. The historical practices of the partnership are a factor to be considered in determining the scope of the partnership business or whether the partner had actual authority. In *Reliable,* the court was attempting to determine whether the partner had the actual or apparent authority to execute the employment contract on behalf of the partnership. *Id.* at 197-98, 194 N.W.2d at 599. The court found that the partner had actual authority in the execution of the contract and his actions were consistent with the historical practices of the partnership. *Id.*

Moreover, merely shifting the focus of the analysis to the historical practices of the partnership reveals other evidence that obtaining financing for DWA was a integral part of the H & W's business. As mentioned previously, it is undisputed the H & W relied on DWA's rental income for its own viability, and therefore

14

had an interest in keeping DWA in business. It has also been shown that Wilkerson executed a similar promissory note with Quaker Fabric Corporation and had even encouraged Lackawanna to inquire into that arrangement. In addition to the Quaker note, there were two other times H & W executed agreements in order to facilitate financing for DWA. On May 1, 1991, Wilkerson and Helms signed a Hypothecation Agreement in favor of Trustmark National Bank pledging H & W's assets so DWA could get additional money on a line of credit. Also in August 1991, H & W executed a UCC Financing Statement in favor of Trustmark National Bank for the purpose of lending money to DWA. Appellants argue that these incidents are "exceptions" to the way business was usually done because both partners signed the agreements. Both partners, however, signed the Lackawanna security agreement shortly after the August 8 promissory note was executed. What is reasonably apparent from these transactions is that H & W Partnership had a continued and necessary interest in obtaining financing for DWA that would subsequently benefit the partnership. The prior transactions further substantiate that this practice was an ordinary and consistent manner in which the partnership carried out its business. Wilkerson's actions were within the scope of the partnership business when he executed the note in favor of Lackawanna.

## IV.

Lastly, the appellees cross-appeal the amount of attorneys'

15

fees.   USL had requested $192,994.00[8] in total attorneys' and paralegal fees.   There were nine attorneys and seven paralegals involved from Wisconsin and Mississippi.[9]   The district court reduced the amount of the fees on two grounds:  first, the court determined that some of the hours expended were duplicative, excessive or otherwise unnecessary;  second, the court reduced the hourly rate and valued the services according to the customary fee charged in the court's district for similar services and quality of work.   Following the Lodestar formulation, the district court calculated and awarded $82,653.50.

In determining the reasonableness of an attorneys' fee award, an appellate court is limited to considering whether the district court abused its discretion.  *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1094 (5th Cir.1982);  *Davis v. City of Abbeville,* 633 F.2d 1161, 1163 (5th Cir.1981);  *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 720 (5th Cir.1974).   This determination rests on a careful review of the district court's basis for the award, including its consideration of the criteria set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).  *King v. McCord,* 621 F.2d 205, 206 (5th Cir.1980).   If these factors are not evaluated and explained, the case will be

---

[8]USL points out that there was a mathematical error in the number of hours expended by an attorney.  USL recalculated the amount after reducing the hours, and now requests a total award of $162,910.00.

[9]USL was represented by Foley & Lardner of Milwaukee, Wisconsin.  Foley & Lardner associated the Mississippi law firm of Holcomb, Dunbar, Connell, Chaffin & Willard to assist them as local counsel.

remanded, if necessary, for an explanation to facilitate appellate review. *Davis,* 633 F.2d at 1163. USL argues that the district court abused its discretion because the fees were not contested by Helms or H & W and therefore should have never been reduced. Alternatively, they argue that the district court abused its discretion in reducing the hours and rates requested.[10]

It is within a district court's sound discretion to reduce the amount of an attorneys' fee award, including an award that is uncontested by an opposing party. The court is limited in its discretion only by the considerations espoused in *Johnson.* Here the district court attentively evaluated the *Johnson* factors as applied to each attorney and paralegal involved in this case. The district court carefully reviewed the time sheets, thoroughly considered the applicable factors, and set forth its explanation in a well-reasoned memorandum. We cannot say the district court abused its discretion in awarding attorneys' fees of $82,653.50.

FOR THE FOREGOING REASONS, the district court is AFFIRMED.

---

[10]It could be argued that the *Johnson* considerations do not apply at all because *Johnson* only provides guidance for awarding attorneys' fees in actions based on federal law. This creates a potential conflict of law issue in determining whether Mississippi or Wisconsin law is applicable. Regardless of the applicable law, the review of the award of attorneys' fees is deferential. Moreover, both states have accepted in notable fashion the *Johnson* factors in determining reasonable attorneys' fees. *See e.g., Standard Theatres, Inc. v. Department of Transp.,* 118 Wis.2d 730, 749 & n. 9, 349 N.W.2d 661, 672 & n. 9 (1984); *Creekmore v. Creekmore,* 651 So.2d 513, 520 (Miss.1995); *Carter v. Clegg,* 557 So.2d 1187, 1192 (Miss.1990). Therefore, we find the district court's analysis under *Johnson* and its progeny is appropriate.