# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 02-2309 & 02-2420

_____

Brian Andreas, an individual,      *
     *

     Appellant/Cross-Appellee,      *
     *

     v.      *
     *

Volkswagen of America, Inc.,      *
doing business as Audi of America,      *      Appeals from the United States
Inc., a New Jersey Corporation,      *      District Court for the
     *      Northern District of Iowa.

     Appellee,      *
     *

McKinney & Silver, Inc., a      *      [PUBLISHED]
Delaware Corporation,      *
     *

     Cross-Appellant/Appellee.      *
     *

_____

Submitted: March 13, 2003
Filed: July 21, 2003

_____

Before HANSEN,[1] Chief Judge, JOHN R. GIBSON and LOKEN, Circuit Judges.

_____

_____

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

HANSEN, Circuit Judge.

A jury awarded Brian Andreas a total of $965,000 in his copyright infringement action against Volkswagen of America, Inc., doing business as Audi of America, Inc. (hereinafter "Audi") and McKinney & Silver, Inc. (hereinafter "M&S"), Audi's advertising agency. The jury found that the defendants violated federal copyright law when M&S included a phrase from one of Andreas's copyrighted works in a television commercial that it created for the introduction of the Audi TT coupe. Andreas appeals the district court's grant of judgment as a matter of law to Audi on Andreas's jury award of $570,000 representing Audi's ill-gotten profits. M&S cross-appeals the district court's denial of its motion for remittitur on Andreas's award of $280,000 for M&S's profits. We reverse the district court's grant of Audi's motion for judgment as a matter of law and affirm the court's denial of M&S's motion for remittitur.

I.

Brian Andreas, an artist and author from Decorah, Iowa, created a drawing in 1994 entitled "Angels of Mercy," which he paired with the accompanying text he authored: "Most people don't know that there are angels whose only job is to make sure you don't get too comfortable & fall asleep & miss your life." The work was copyrighted and copies of it were included in numerous books. Prints of the work have been sold throughout the United States.

M&S created three television commercials to promote Audi's initial release of the Audi TT coupe into the United States market. One of the television commercials, referred to as the "Wake Up" commercial, depicted an Audi TT coupe in a garden surrounded by angelic looking, neoclassical statues. The commercial contained a voice-over, which says in its entirety: "I think I just had a wake-up call, and it was disguised as a car, and it was screaming at me not to get too comfortable and fall

asleep and miss my life." The commercial aired from May through October 1999, when Audi pulled the commercial after the allegations of copyright infringement were brought to its attention.

Andreas brought a copyright infringement action against M&S and Audi. Prior to trial, the district court granted Audi's motion in limine, precluding Andreas from introducing evidence of Audi's gross revenues from sales of any automobile other than the TT coupe depicted in the commercial. The case proceeded to trial. Following Andreas's presentation of his case, Audi and M&S made a written Rule 50(a) motion for judgment as a matter of law, which they renewed after submission of all of the evidence. The district court reserved ruling on the renewed motion. The jury returned a verdict for Andreas, awarding him $115,000 in actual damages, $280,000 for M&S's profits from the infringement, and $570,000 for Audi's profits from the infringement. M&S and Audi are jointly and severally liable for the actual damages, and each is liable for its own profits award. Following the verdict, Audi and M&S filed a joint Rule 50(b) motion on Andreas's profits claims against each of them. The district court granted Audi's motion and vacated the jury's $570,000 award representing Audi's profits. The court denied M&S's motion.

In this appeal, none of the parties dispute the jury's finding of a copyright infringement or the $115,000 actual damages award. Andreas appeals the district court's grant of the motion for judgment as a matter of law to Audi, alleging that Audi's motion was untimely and therefore the district court lacked jurisdiction to rule on the motion. On the merits, Andreas argues that he met his burden of establishing a causal connection between the infringement and Audi's profits from the TT coupe. Andreas also argues that the district court erred in granting Audi's pretrial motion in limine and precluding him from introducing evidence of Audi's revenues from all of its automobile sales during the relevant time period. M&S cross-appeals, arguing that the district court erred in failing to remit the award of M&S profits.

## II. Jurisdiction

As noted above, during trial Audi and M&S filed a motion for judgment as a matter of law (JAML) and supporting brief on November 30, 2001, following Andreas's presentation of evidence. The court denied the motion as to three issues and reserved judgment on the final issue. Audi orally renewed the motion before the case was submitted to the jury, and the court again reserved ruling. The jury returned its verdict on December 4, 2001, and the court entered judgment in accordance with the verdict on December 5, 2001. On December 19, 2001, the last available day for filing a Rule 50(b) motion, Audi filed a motion for judgment as a matter of law "pursuant to Rule 50" "on plaintiff's []claim for profits." (Appellant's App. at 277-78.) The motion noted that pursuant to the parties' conference with the judge, a supporting memorandum would be submitted following receipt of the trial transcript. The motion also sought a reduction in the award of M&S's profits or a new trial on the issue. The parties subsequently briefed the motion and the district court entered its Amended Judgment and Order on April 24, 2002. Andreas filed this appeal on May 15, 2002.

Andreas argues that the motion for JAML was defective because it failed to meet the requirements of Federal Rule of Civil Procedure 7, which states that motions "shall state with particularity the grounds therefor," Fed. R. Civ. P. 7(b)(1), and that the subsequently filed briefs were well beyond the ten-day time limit for filing JAML motions. See Fed. R. Civ. P. 50(b). Without a proper timely motion, the district court, according to Andreas, lacked jurisdiction to enter the amended judgment and order. See U.S. Leather, Inc. v. H & W P'ship, 60 F.3d 222, 225 (5th Cir. 1995) (ten-day period to file posttrial motions is jurisdictional); Fed. R. Civ. P. 6(b) (district court may not enlarge time to file Rule 50(b) motion). If Andreas is correct, then we must dismiss this appeal because the Rule 50 motion was not an adequate motion and it did not toll the time in which Audi had to file its notice of appeal under Federal Rule of Appellate Procedure 4(a)(4)(A)(i), which provides four instances, including

4

a Rule 50 motion, that will toll the time for filing a notice of appeal.  See Riley v. N.W. Bell Tele. Co., 1 F.3d 725, 727 (8th Cir. 1993) (dismissing for lack of appellate jurisdiction where notice of Rule 52(b) and Rule 59 motion was not sufficiently particular and therefore did not toll time for appeal).  The district court rejected Andreas's argument, finding that the issue of profits had been extensively briefed and argued throughout the litigation, was the subject of Audi's motion in limine and its Rule 50(a) motion, and that the parties and the court were sufficiently on notice of what issue was at stake in the Rule 50(b) motion.

Andreas's argument turns on whether the district court properly looked to the Rule 50(a) pleadings in finding that the Rule 50(b) motion was sufficiently particular. Andreas does not dispute that if we consider the previous filings, the postjudgment motion was adequate.  Our review is de novo, as the dispute involves the legal jurisdictional issue of whether the court properly looked to pleadings filed outside of the ten-day period to determine whether the Rule 50(b) motion was sufficiently particular.  See Trimble v. Asarco, Inc., 232 F.3d 946, 959 (8th Cir. 2000).

Rule 7 is a general rule that applies to all motions.  The purpose of Rule 7's particularity requirement is to give notice of the basis for the motion to the court and the opposing party so as to avoid prejudice, "providing that party with a meaningful opportunity to respond and the court with enough information to process the motion correctly."  Registration Control Sys., Inc. v. Compusystems, Inc., 922 F.2d 805, 807 (Fed. Cir. 1990); see also Calderon v. Kan. Dep't of Soc. & Rehab. Servs., 181 F.3d 1180, 1186 (10th Cir. 1999) ("By requiring notice to the court and the opposing party of the basis for the motion, Rule 7(b)(1) advances the policies of reducing prejudice to either party and assuring that 'the court can comprehend the basis of the motion and deal with it fairly.'" (quoting 5 Wright & Miller, Federal Practice And Procedure § 1192 at 42 (2d ed.1990))). The particularity requirement should not be applied in an overly technical fashion when the purpose behind the rule is not jeopardized.  See

Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 761 (1st Cir. 1996) (citing 5 Wright & Miller, Federal Practice and Procedure, § 1192, at 43).

"Courts routinely take into consideration other closely filed pleadings to determine whether sufficient notice of the grounds for the motion are given and the opposing party has a fair opportunity to respond." Id. However, filings made after the filing period cannot save a deficient motion made within the period, because to do so would allow parties to eviscerate the purpose of the time limitation. See Riley, 1 F.3d at 726-27 (holding that subsequent memorandum of law in support of a notice of a Rule 52(d) and Rule 59(a)(2) motion did not save a bare-bones notice, that itself was not even a motion); Martinez v. Trainor, 556 F.2d 818, 820 (7th Cir. 1977). These cases are really inapposite here, however, because the district court looked to filings made before the deadline, namely the Rule 50(a) motion and related filings and the motion in limine made prior to trial. The First Circuit found that a vague Rule 50(b) motion was sufficiently particular by looking to the Rule 50(a) filings, as well as a motion for extension of time to file briefs related to the Rule 50(b) motion that provided a more detailed explanation of the grounds for the Rule 50(b) motion. See Cambridge Plating Co., 85 F.3d at 761. The court found that from these related filings "[t]he grounds Napco would press in its post-judgment motions were sufficiently known." Id.

We reject Andreas's attempt to distinguish Cambridge Plating Co. on the basis that it relied on filings made during the ten-day period for filing the Rule 50(b) motion as opposed to filings made prior to that time period. Although Cambridge Plating Co. involved an extension motion made during the ten-day period, the court also looked at the Rule 50(a) filings that were made prior to judgment, and thus before the ten-day time period began to run. In the present case, the district court rightly looked to the Rule 50(a) pleadings. By definition, a Rule 50(b) motion is a renewal of a prior Rule 50(a) motion made at the close of the evidence and as such is limited to those issues raised in the previous motion. See Fed. R. Civ. P. 50(b); see

6

also <u>Midamar Corp. v. National-Ben Franklin Ins. Co. of Ill.</u>, 898 F.2d 1333, 1337 (8th Cir. 1990) ("[A] party cannot assert a ground in a [Rule 50(b)] motion for judgment notwithstanding the verdict that was not previously asserted in the party's [Rule 50(a)] motion for a directed verdict." (internal quotations omitted)). Audi's Rule 50(a) motion and related filings raised four issues: 1) no evidence of access to the copyrighted material; 2) no evidence that the material was copied; 3) no evidence of Andreas's actual damages; and 4) no evidence that Audi's profits from the TT coupe or M&S's fees were related to the allegedly infringing commercial. The Rule 50(b) motion referred to "Andreas' claim for profits," (Appellant's App. at 277), which sufficiently alerted Andreas and the court to which of the issues in the Rule 50(a) motion Audi and M&S were raising.

Andreas also argues that we should reject M&S's cross-appeal of the district court's denial of its motion for remittitur because that motion was likewise deficient under Rule 7. The motion specifically stated that "if the Court decides not to vacate the award of McKinney & Silver's profits, the Court should either reduce the award or order a new trial on the issue of McKinney & Silver's profits pursuant to Federal Rule of Civil Procedure 59." (Appellant's App. at 277.) The motion for remittitur clearly stated the grounds for the motion–a reduction in the award, which is the only basis for a motion for remittitur. M&S's cross-appeal only goes to the district court's denial of remittitur, not to the denial of a new trial. The district court therefore properly exercised jurisdiction over the motion for remittitur.

Having determined that the district court properly exercised jurisdiction over the posttrial motions, we turn to the merits of the appeals.

### III. Award of Audi's Profits

The district court granted Audi's motion for JAML and vacated the jury's $570,000 award representing Audi's profits generated by the illegal copyright

infringement. The court found that the award was too speculative because Andreas failed to prove a causal connection between the infringement and Audi's profits from the TT coupe. The award equaled 10% of Audi's after-tax profits on the TT coupe sales during the time the commercial aired. We review a district court's ruling on a motion for JAML de novo, applying the same standard utilized by the district court.

> [T]he law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused. Where conflicting inferences reasonably can be drawn from the evidence, it is the role of the jury, not the court, to determine which inference shall be drawn. Only where all of the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict should the grant of a motion for judgment as a matter of law be affirmed. Thus, it is improper to overturn a jury verdict unless, after giving the nonmoving party the benefit of all reasonable inferences and resolving all conflicts in the evidence in the nonmoving party's favor, there still exists a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party.

First Nat'l of Omaha v. Three Dimension Sys. Prods., Inc., 289 F.3d 542, 544 (8th Cir. 2002) (internal quotations omitted); see also White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992) ("[T]o sustain a motion for j.n.o.v., all the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party.").

The Copyright Act provides that a copyright holder is entitled to recover his actual damages as well as "any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages." 17 U.S.C. § 504(b) (2000). The infringer's profits are awarded to the copyright holder "to prevent the infringer from unfairly benefiting from a wrongful act." H.R. Rep. No. 94-1476, § 504, at 161 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5777. "In establishing the infringer's profits, the copyright owner is required to present proof

8

only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses <u>and the elements of profit attributable to factors other than the copyrighted work</u>." § 504(b) (emphasis added). "[W]here some of the defendant's profits result from the infringement and other profits are caused by different factors, . . . the burden of proof is on the defendant . . . [to] prove not only 'his or her deductible expenses' but also 'the element of the profit attributable to factors other than the copyrighted work.'" H.R. Rep. No. 94-1476, § 504, at 161 (quoting § 504(b)). "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." <u>Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.</u>, 772 F.2d 505, 514 (9th Cir. 1985) (<u>Frank Music I</u>) (internal citations omitted).

Audi does not dispute the jury's finding of copyright infringement, but argues only that Andreas failed to establish a causal connection between the infringement and its gross revenues from the sale of the TT coupe. The district court noted that generally "a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement arises, and the burden then shifts to the defendant to demonstrate what portion of the profits are not traceable to the infringement." (Order at 6.) The court applied a less strict standard, however, because this case involves indirect profits as opposed to direct profits: the infringers did not sell the copyrighted work, but used the copyrighted work to sell another product, the TT coupe. The court found that Andreas's proffered evidence of a connection between the infringement and Audi's revenues from the sale of the TT coupe during the time the commercial aired was too speculative to support the jury's award.

Although cases distinguish between direct and indirect profits, the statute does not. <u>See, e.g.</u>, <u>Mackie v. Rieser</u>, 296 F.3d 909, 914 (9th Cir. 2002) (" On its face, § 504(b) does not differentiate between 'direct profits' . . . and 'indirect profits' . . . ."), <u>cert. denied</u>, 123 S. Ct. 1259 (2003). We agree that in an indirect profits case the

profits "attributable" to the infringement are more difficult to quantify. But that difficulty does not change the burden of proof established by the statute. The burden of establishing that profits are attributable to the infringed work often gets confused with the burden of apportioning profits between various factors contributing to the profits. "[T]he plaintiff has the 'burden' to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur." Mackie, 296 F.3d at 915 (citing Univ. of Colo. Found. v. Am. Cyanamid Co., 196 F.3d 1366, 1375 (Fed. Cir. 1999), cert. denied, 529 U.S. 1130 (2000)). The nexus requirement exists in both direct and indirect profits cases. See, e.g., Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983) (holding in direct profits case that plaintiff could not meet its burden of establishing defendant's gross revenue attributable to infringement by showing gross revenues from everything defendant sold; plaintiff should have established revenues from the sale of the infringing product). Once that nexus is established in either a direct or indirect profits case, if "an infringer's profits are attributable to factors in addition to use of plaintiff's work, an apportionment of profits is proper. The burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's." Frank Music I, 772 F.2d at 518 (internal citations omitted) (holding that infringing use of music in one of ten acts of Las Vegas casino musical revue entitled copyright holder to portion of casino's hotel and gaming operations based on revue's promotional nature).

The district court here concluded that the uncertainties in the evidence went to whether Audi profited from the infringing commercial at all–for which Andreas carried the burden of proof–rather than the extent that it profited from the infringement–for which Audi carried the burden of proof–because Andreas failed to prove that the infringed words resulted in the sale of any TT coupe. (Order at 9 ("While most people believe that advertising contributes somehow to the sales of motor vehicles, it is not sufficient for a plaintiff to rely on such intuitive notions as proof of causation.").) However, in ruling on a motion for JAML, the evidence is to

be read to support the verdict if at all reasonable. Andreas introduced more than mere speculation that the Wake Up commercial contributed to sales of the TT coupe. The infringement was the centerpiece of a commercial that essentially showed nothing but the TT coupe. The evidence established that Audi enthusiastically presented the commercial to its dealers as an important and integral part of its launch of the TT coupe into the U.S. market; sales of the TT coupe during the period that the commercial aired were above Audi's projections; the three commercials received high ratings on the Allison-Fischer surveys that rated consumer recall of the commercials; and Audi paid M&S a substantial bonus based on the success of the commercials. Reading this evidence in the light most favorable to the verdict, the commercial did more than merely "contribute[] somehow," id., to sales of the TT coupe. See Frank Music I, 772 F.2d at 517 (holding that statement in MGM's annual report that its gaming operations were "materially enhanced by the popularity of the hotel's entertainment[, including] 'Hallelujah Hollywood,' the spectacularly successful production revue" provided sufficient evidence that the infringing use of six minutes worth of music in one of ten acts in the revue contributed to MGM's gaming profits, making an award proper if ascertainable). We conclude the jury had enough circumstantial evidence to find that the commercial contributed to the profitable introduction of the TT coupe, which shifted the burden to Audi of showing what effect other factors had on its profits.

Audi argues that numerous unknown elements other than the commercial, let alone the infringing words contained in the commercial, contributed to sales of the TT coupe, and that therefore the award was based on speculation. We recognize that the offending commercial probably did not contribute to every purchase of a TT coupe during the relevant time period. Undoubtedly, some buyer somewhere bought a TT coupe without having seen the commercial despite Audi's extensive use of it. But we reject the notion that Andreas was required to put a TT buyer on the stand to testify that she bought the car because of the commercial in order to meet his burden of a causal connection. Once a nexus was shown as established above, Andreas was

11

required under the statute only to establish Audi's gross revenue from the TT coupe. Audi then bore the burden of establishing that its profit was attributable to factors other than the infringing words: the other two commercials that did not contain the infringed words, other parts of the Wake Up commercial, customer loyalty, brand recognition, etc. See id. (holding that infringing defendant had burden of establishing that gaming profits derived from factors other than infringing use of music in promotional production and remanding for new damages calculation where original calculation did not include any of defendant's indirect profits). "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." Id. at 514 (internal citations omitted).

The district court's error was in placing the detriment of any speculation on Andreas rather than on Audi.[2] The question of allocating an infringer's profits between the infringement and other factors, for which the defendant infringer carries the burden, is "highly fact-specific," Estate of Vane v. The Fair, Inc., 849 F.2d 186, 190 (5th Cir. 1988), cert. denied, 488 U.S. 1008 (1989), and should have been left to the jury. See also Frank Music Corp. v. Metro-Goldwyn-Mayer Inc., 886 F.2d 1545, 1550 & n.4 (9th Cir. 1989) (Frank Music II) (awarding nearly $700,000 of infringer's indirect profits in appeal from remand of Frank I based on district court's finding that

_____

[2]The court's error is revealed in some of the cases upon which it relied, which were actual damages cases rather than infringer's profits cases. See, e.g., Order at 7, citing Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1170 (1st Cir. 1994) for the proposition that "[t]he plaintiff bears the burden of proving that the infringement was the cause of its loss of revenue;" Order at 8, citing Frank I, 772 F.2d at 513, for the proposition that a court may reject a proffered measure of damages if it is too speculative. Both cases were discussing actual damages to the copyright holder, who retains the burden of establishing damages in an actual damages case. That burden is shifted to the infringing defendant when the infringer's profits are at stake. The result of a failure in the evidence should fall on the party carrying the allocation burden, in this case Audi.

12

2% of MGM's indirect profits were attributable to infringement, which finding court of appeals held was not clearly erroneous where district court, sitting as fact finder, considered other factors attributing to total profits), <u>cert. denied</u>, 494 U.S. 1017 (1990).

Having concluded that Andreas met his burden of establishing a nexus between the infringement and Audi's sale of TT coupes, we also believe that the jury's award was not overly speculative. The total profit upon which the jury based its award was limited to Audi's profit generated only by the sale of the TT coupe, and only during the time that the "Wake Up" commercial aired. The evidence established that Audi sold 5,384 TT coupes in 1999, but that number was reduced to account for the 238 pre-ordered vehicles, leaving 5,146 TT coupe sales between May and the end of the year that were potentially related to the infringing commercial. Audi realized $153,700,000 gross revenue on the sale of the limited number of TT coupes and an after-tax profit of $5,700,000. (Appellant's App. at 493-94.) The jury awarded Andreas $570,000, or 10% of that profit generated by the sale of the TT coupe during the time period that the commercial aired as the profit attributable to Audi's infringing use of Andreas's copyrighted work. Conversely, the jury impliedly found that 90% of Audi's profit was attributable to factors other than the infringement. As we have held, Audi bore the burden of establishing the portion of its profit attributable to factors other than the infringement. This evidence provides a nonspeculative basis for the jury's award, and it is precisely the jury's function as the factfinder to do so. <u>See, e.g.</u>, <u>Frank Music II</u>, 886 F.2d at 1550 (affirming district court's factual finding that 2% of casino's gaming and hotel profits were attributable to promotional value of music revue).

This evidence also distinguishes this case from many of the cases relied upon by Audi, where the plaintiffs failed to establish any nexus at all between the infringement and the profits the plaintiff sought. <u>See, e.g.</u>, <u>Univ. of Colo.</u>, 196 F.3d at 1375 (holding that the plaintiff failed to establish connection between use of

infringed work in patent application and later sale of patented product; use of infringing material in patent application contributed to receipt of patent, but no evidence tied infringement to sale of end product); Bus. Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 404 (2d Cir. 1989) (noting difficulty in establishing connection between use of infringed work and increased goodwill and market enhancement as opposed to direct revenues); Rainey v. Wayne State Univ., 26 F. Supp. 2d 963, 971 (E.D. Mich. 1998) (holding no causal connection established between artist's work in brochure, distributed at car show where no cars were sold, and defendant's increased goodwill); Mackie, 296 F.3d at 916 (finding evidence of connection too speculative where infringement was limited to one page of multipage brochure advertising a series of concerts and plaintiff based its claim for 1.5% of Symphony's total revenues on Symphony's goal of generating 1.5% response rate to brochure as a whole).

We recognize that it is difficult to establish the portion of profits attributable to an infringement in cases where the infringed material is used in an advertisement for another product, but Congress put the burden of establishing "elements of profit attributable to factors other than the copyright work" on the defendant. Further, Congress did not distinguish between direct and indirect profits cases in allocating the burden of proof between establishing the fact that an infringement contributed to a defendant's profits and the extent to which the infringement contributed to the profits. We hold that the jury's conclusion that Andreas established a nexus between Audi's infringing use of his copyrighted work and Audi's profits from the sales of the TT coupe is sufficiently supported by the evidence so as to defeat a motion for JAML. The district court erroneously placed the burden of establishing the extent that the infringement contributed to Audi's profits on Andreas rather than on Audi as the infringing defendant.

## IV. Exclusion of Evidence

Andreas also argues that the district court erred in granting Audi's motion in limine which prevented Andreas from introducing evidence at trial of Audi's profits from all Audi models during the time the commercial aired. We review the district court's exclusion of evidence for a clear abuse of discretion. See Simco v. Ellis, 303 F.3d 929, 934 (8th Cir. 2002).

Andreas argues that the commercials for the TT coupe were intended to get customers into dealers' showrooms and to sell other Audi models. The commercial was for the TT coupe, however, and no specific dealer or other Audi model was mentioned in the commercial. Further, the infringement involved only the words used in the commercial, not the whole commercial. The only evidence Andreas offered to tie the infringing use of the words in the commercial to the sale of other Audi models was 1) the disproportionately high cost of the commercial as a percentage of Audi's total advertising budget and as related to projected sales of the TT coupe, 2) and Audi's purported intent to use the TT coupe as the "image building spearhead" of its fleet.

Although the Copyright Act places the burden on the defendant of apportioning the defendant's profits between the infringement and other factors, the copyright holder must first establish some connection or relationship between the infringement and the profits he seeks. We hold today that Andreas met his burden with respect to the TT coupe, but we cannot say the same for all other Audi models. It is not enough to show an infringement and then seek all of the defendant's profits, from whatever source. See Taylor, 712 F.2d at 1122 ("Taylor could have made out a prima facie case for an award of infringer's profits by showing Meirick's gross revenues from the sale of infringing maps. It was not enough to show Meirick's gross revenues from the sale of everything he sold . . . . ").

15

Andreas's reliance on Sunset Lamp Corp. v. Alsy Corp., 749 F. Supp. 520 (S.D.N.Y.1990), as authority for recovering profits on other items where infringement enhances sales of a "door opener" product takes the reasoning of that case too far. The defendant in that case infringed the plaintiff's copyright on a floor lamp and sold similar lamps. The court allowed the plaintiff to present evidence of profits that the plaintiff lost on other lamps because the infringed lamp was intended as a "door opener" into a broader line of lamps. As that court noted, the plaintiff was required to present credible evidence of a relationship between sales of the infringed lamp and sales of noninfringed lamps. Id. at 524-25. The infringement in that case went to the "door opener" product being sold, not to an advertisement for the door opener product. The fact that Audi intended to use the TT coupe–which did not itself infringe on Andreas's copyright–as its spearhead for other models does not sufficiently tie the infringing use of the words in the TT coupe commercial to profits from other Audi cars. Likewise, Andreas's evidence regarding sales of the TT coupe does not tie the infringing words in the commercial to sales of other Audi models. The district court did not err in excluding the evidence of profits from models other than the TT coupe.

## V. Remittitur of M&S Profits Award

The district court denied M&S's motion for a new trial or remittitur. M&S appeals only the denial of its motion for remittitur, a decision we will reverse only "upon a manifest abuse of discretion or because the verdict is so grossly excessive the result is monstrous or shocking." Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1133-34 (8th Cir. 2001). The jury awarded Andreas $280,000 for M&S's ill-gotten profits. M&S earned an annual fee of $6,850,000 and a bonus of $480,000 from work on the Audi account. M&S introduced evidence that its profit during the relevant time during which the Wake Up commercial was produced–September 1998 through February 1999–was only $546,821 and that its fee was based solely on the number of employee hours spent working on the Audi account. M&S admits that at least

90% of its work performed during the limited time period was related to the three TT coupe commercials. On appeal, M&S argues that remittitur is necessary because the evidence at trial proved at most a damages award of one-third of its profits (because it allegedly was working equally on all three commercials), or $182,255, but that the jury's $280,000 award was almost half of its profit.

M&S ignores the fact that it carried the burden of establishing its "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." § 504(b). Doubt as to the computation of profits is resolved in the copyright holder's favor. Where the infringing defendant fails to meet its burden of proving profits, the gross figure may stand as the defendant's profits from the infringement. <u>Frank Music I</u>, 772 F.2d at 514. Further, M&S's argument is based on its witnesses' vague testimony that its employees spent approximately equal time on each of the three commercials. This evidence was undisputed only because M&S did not keep detailed time records to determine how much time was spent on each commercial. Given the lack of detailed records, the jury was free to discount M&S's estimates of how much of its profit was related to the infringement. The difference between one-half of its profits and one-third of its profits is not so monstrous, shocking, or grossly excessive in this case that we can say the district court manifestly abused its discretion in denying the motion.

## VI. Conclusion

We reverse the district court's grant of Audi's judgment as a matter of law and reinstate the jury's $570,000 award of profits. The district court's rulings are affirmed in all other respects.

17

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.